IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

DAVID WARREN,

　　　　　　　　　　　*Plaintiff*,

　　　　v.

TRI TECH LABORATORIES, INC.,

　　　　　　　　　　　*Defendant*.

CIVIL ACTION NO. 6:12-CV-00046

<u>MEMORANDUM OPINION</u>

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

　　　　The *pro se* Plaintiff, David Warren, filed this action claiming race-based discriminatory treatment in employment and wrongful dismissal in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964.  Defendant, Tri Tech Laboratories, Inc. ("Tri Tech"), has filed a motion for summary judgment, which I will grant.  The summary judgment record reveals that Plaintiff was terminated for legitimate non-discriminatory reasons that have nothing to do with his race.

**I.**

　　　　"[S]ummary judgment is warranted if, from the totality of the evidence, including pleadings, depositions, answers to interrogatories, and affidavits, the court believes no genuine issue of material fact exists for trial and the moving party is entitled to judgment as a matter of law."  *Whiteman v. Chesapeake Appalachia, L.L.C.*, 729 F.3d 381, 385 (4th Cir. 2013) (citing Fed. R. Civ. P. 56[1]; *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 817 (4th Cir. 1995)).

---

[1] Rule 56 of the Federal Rules of Civil Procedure was amended significantly in 2010, but the standard for granting summary judgment remains unchanged, and is so well-settled that it ordinarily does not merit much
(continued...)

A genuine factual dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Defendant propounded written discovery to Plaintiff, and Defendant notified Plaintiff that it intended to take depositions of three of its former employees (including the decision maker who hired and fired Plaintiff). Plaintiff failed to respond to Defendant's discovery requests, and Plaintiff did not attend the depositions. Having failed to participate in discovery, Plaintiff nonetheless submitted 538 pages of documents purportedly in response to Defendant's motion, and Plaintiff attended the hearing, where he presented his arguments. Plaintiff's response includes two "Statements of Disputed Material Fact," two affidavits (Plaintiff's own 76-page affidavit, and one from his wife), and an abundance of exhibits. *See* docket nos. 42, 43, 44, and 45. However, the evidence Plaintiff has submitted is often not credible, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 330-34 (1986), and is largely inadmissible, *see Anderson*, 477 U.S. 247-48; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).[2] The vast

---

[1](...continued)

discussion. The language of subdivision (a) continues to require that there be "no genuine dispute as to any material fact and" that the movant shows that it "is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a).

[2] I have considered Plaintiff's submissions. However, had this matter gone to trial, I likely would have been obligated to exclude the bulk of it, pursuant to Defendant's motion under Fed. R. Civ. P. 37, as Plaintiff failed to answer Defendant's discovery and apparently failed to provide to Defendant a copy of a list of witnesses he intended to call at trial or exhibits he intended to introduce, and offers no justification for a failure to disclose such documents or witnesses. Defendant would be unfairly prejudiced if witnesses and documents not previously identified or produced were allowed at trial. *See, e.g., Projects Management Co. v. Dyncorp Intern. LLC*, 734 F.3d 366 (4th Cir. 2013) (observing that trial court's discretion extended so far as to dismiss case for discovery abuses, including the failure to timely provide discovery); *Digital Vending Services Intern., Inc. v. University of Phoenix, Inc., et al*, 2013 WL 5533233, Civ. Action No. 2:09-cv-00555 (E.D. Va. 2013) (prohibiting use of documents not timely disclosed at trial as well as other sanctions); *Chester v. U.S. Sec. Associates*, 2013 WL 3712331, Civ. Action No. 3:12-cv-00204 (W.D. N.C. 2013) (striking documents not previously produced); *Baldwin v. Brethren Mut. Ins. Co.*, 2012 WL 531009, Civ. Action No. 1:10-cv-03227 (D. Md. 2012) (granting summary judgment because pro se plaintiff could not prove damages because of her failure to answer discovery). Additionally, any of Plaintiff's documentary evidence and his own testimony

(continued...)

majority of Plaintiff's submissions rely on speculation, hearsay, or opinion to dispute the evidence submitted by Defendant.  To show that a genuine dispute of material fact exists (or does not exist), a party may not rest upon his own mere allegations or denials.  *See Celotex*, 477 U.S. at 324.  Rather, the

> party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A)   citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]

Fed. R. Civ. P. 56(c)(1)(A); *see also Cray Communications, Inc. v. Novatel Computer Systems, Inc.*, 33 F.3d 390 (4th Cir. 1994); *Orsi v. Kickwood*, 999 F.2d 86 (4th Cir.1993).

Here, Plaintiff relies on his own statements and his own characterization of the various documents he has submitted to argue that he was treated differently than Defendant's white employees.  However, other than his own assertions, Plaintiff cannot presently point to any evidence that supports his claim, and Plaintiff's "own naked opinion" that he was a victim of discrimination is not enough to create a genuine dispute of material fact.  *Goldberg v. B. Green and Co., Inc.*, 836 F.2d 845, 848 (4th Cir. 1988).  Plaintiff's speculative assertions regarding Defendant's "state of mind" or "motivation" do not suffice.  *Id*.  Plaintiff must "proffer[] sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial.  *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993).

A district court has an "affirmative obligation . . . to prevent 'factually unsupported claims

---

[2](...continued)

that was not excluded under Rule 37 would still need to show sufficient probative value under Rule 403 of the Federal Rules of Evidence.

[or] defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 323-24).   Given the record Defendant has developed and submitted in support of the motion, Defendant has satisfied its burden of showing the absence of any genuine issue of material fact, and Plaintiff has failed to rebut that showing. *See Whiteman*, 729 F.3d at 385 n. 7 (citing *Celotex*, 477 U.S. at 322–23 ; *Anderson*, 477 U.S. at 248).

## II.

On September 17, 2012, Plaintiff filed "this action in order to enforce his rights to be free from discrimination based upon his race as provided by Civil Rights Act of 1964, as amended, 42 U.S.C. § 1981."   The complaint states, in part (paragraph numbering and exhibit citations omitted; quoted verbatim except for bracketed insertions):[3]

> Plaintiff is an African American male citizen of the Unites States who resides in McKinney, Texas.

> Defendant Tri Tech Laboratories, Inc. is a foreign corporation licensed and doing business in the State of Virginia.  Tri Tech Laboratories is a contract or third party manufacturer of beauty and cosmetic products.

> Plaintiff filed a timely Charge of Discrimination with the United States Equal Employment Opportunity Commission [the "EEOC"] and received his Notice of Right to Sue on June 18, 2012.

---

[3] The complaint generally does not comply with Rule 8(a)(2) of the Federal Rules of Civil Procedure, which requires a short and plain statement of why the pleader is entitled to relief.  However, a court must construe the pleadings of a *pro se* plaintiff liberally, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007), especially when the plaintiff alleges civil rights violations, *Brown v. N.C. Dep't of Corrections*, 612 F.3d 720, 724 (4th Cir. 2010); *see also Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978).  Still, although a court must provide leeway to a *pro se* plaintiff, this "leeway must be tempered to require the Plaintiff to comply with . . . the pleading requirements of Rule 8," *Davis v. Bacigalupi*, 711 F. Supp. 2d 609, 615 (E.D. Va. 2010), and a court may not act as the litigant's advocate and construct legal arguments that the plaintiff has not made, *see Brock v. Carroll*, 107 F.3d 241, 242–43 (4th Cir. 1997) (Luttig, J., concurring); *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

-4-

* * *

Plaintiff began employment with Defendant as the Director of Quality on February 4, 2012 at its Lynchburg, Virginia facility.

Defendant's method of selecting which employees are afforded an opportunity to participate in Defendant's well-established and robust, written progressive discipline program is a primary source of discrimination which has resulted in an unfair and wrongful termination of employment opportunities for the Plaintiff.  In its response to the [EEOC] regarding Plaintiff's charge, Defendant referenced its language in its written handbook, citing it reserves the right, in its sole discretion, whether and what disciplinary action will be taken in a given situation.  Defendant then makes an erred statement that Plaintiff was responsible for a mislabeled Over the Counter drug product as credence to its actions.

Defendant stated in its response to the [EEOC] that it terminated Plaintiff's employment due to mislabeled products and complaint from customer.  Although the Plaintiff denies and such allegation of fact surrounding mislabeled products or complaints lodged that were a result of Plaintiff's actions, Caucasian employees have conducted far worse offenses which could and possibly should have resulted in loss of business from its customers prior to Plaintiff's employment.  Those Caucasian employees have not been terminated, reprimanded, or even subjected to any disciplinary actions by Defendant.  On February 8, 2010, approximately four (4) days after Plaintiff's employment began, a formal notice of a recall of products produced by the Defendant in 2011 for microbial contamination of Burkholderia Cepacia prior to Plaintiff's employment was published by the Food and Drug Administration [the "FDA"] for Kao Brands, makers of Jergens and John Freda product dated December 29, 2009.  The products were traced back to Defendants' facility solely and released under the auspices of the quality management system of Mark Hallett, Sr. Director of Quality (Caucasian), Cathleen Owen, Director of Quality (Caucasian), and Blake Hemmel, Manager of Quality (Caucasian).  Manufacturing operations at the facility was halted for approximately one week.  Neither of these Caucasian employees, directly responsible for preventing unadulterated products from entering the marketplace that can harm to the public under Federal Food, Drug, and Cosmetic act, were terminated for their actions.

Prior to Plaintiff's tenure with Defendant and during the approximate time periods of November 2009 and December 2009, Caucasian Employees, Mark Hallett, Cathleen Owen, and Blake Hemmel, released products manufactured for Beauty Avenues, the makers of Bath and Body Works product, that did not meet the legal fill weight under Federal Food, Drug, and Cosmetic Act.  Beauty Avenues raised the issue as a customer complaint during Plaintiff's employment where their stores and patrons complained.  These products were subject to recall under Federal Food, Drug, and Cosmetic Act and could have resulted in loss of business.

Prior to Plaintiff's tenure and while all Caucasian employees were responsible, Defendant has release OTC products that were mislabeled with the wrong expiration date as shown by Defendant's previous year scorecard provided by Beauty Avenues.

Prior to Plaintiff's tenure, Defendant shipped products to Canada that were mislabeled and were not approved through customs in the country.   Caucasian Employees, Mark Hallett and Cathleen Owen were responsible for the released products that were held in customs due to improper labeling of hand sanitizers manufactured for Beauty Avenues, the makers of Bath and Body Works.   Plaintiff corrected the issue where the products could be released from customs and properly enter the Canadian marketplace.

During Plaintiff's employment, Mark Hallett, Caucasian, instructed a change be made to the manufacturing process for liquid moist soaps.   This change caused the products to be adulterated under Federal Food, Drug, and Cosmetic Act, where the products were not homogeneous and a copolymer and acrylic was undispersed in the products.   The defect was noted by the rancidity and foul, sulfur odor caused from the lack of neutralization of the acrylic copolymer to the appropriate pH.   Beauty Avenues, their largest customer, complained about the odor of the Twilight Woods product on or about May 3, 2010.   The Twilight Woods was a new product, with approximately 400,000-500,000 units affected.   These products should ahve been destroyed.   The Caucasian employee was not terminated or subjected to disciplinary actions for his actions.

Additionally, other Caucasian employees have been formally cited for lack of performance and have been afforded opportunities under Defendant's progressive discipline policy, even to the extent of outside counseling assistance for managerial training.

Plaintiff's performance was outstanding and had received praise from internal employees and Defendant's customers, including Bierdorf and Beauty Avenues. Yet, Plaintiff was never informed about his performance or that there was an issue with the customers during his employment; thus he was never given an opportunity to correct any deficiency in his performance.   Defendant has presented no documented evidence of any meeting where Plaintiff and his supervisor discussed a performance issue.

Defendant states to the [EEOC] that Plaintiff was not able to perform up to Tri Tech's expectations for the position.   Upon hire, Mark Hallett, Caucasian, stated to me directly that Cathleen Owen, former Caucasian Director of Quality whose position Plaintiff was hired to replace, was not performing well.   Mrs. Owen was promoted to Regulatory Director for the corporation.   However, he went on to state that she should have been fired because she could not perform the duties.

Defendant states as a precursor to terminating Plaintiff's employment that Beauty

Avenues, its largest customer, was in some way disappointed in his performance. Beauty Avenues has been disappointed with Tri Tech for periods well before the Plaintiff ever heard of the company.  The scorecard provided by the Beauty Avenue in February 2010, reflecting performance for the previous calendar year, states on page 5that Tri Tech should continue to focus on OTC and on pages 3-4 of the document state the Defendant should be proactive in quality issue resolution, improve on the number and percentage of defective products and further states OTC definitely needs improvement in 2010 listing the following poor performance indicators from 2009: 1) mislabeled OTC AB Moisturizing Hand Soap was labeled AB Cleansing Hand Soap, 2)Fragrance didn't match standard, 3) Incorrect expiration date on OTC products, printed 3 year expiration date instead of 2 years, and 4) Finished units were found with mixed price stickers.  In addition to the scorecard, Beauty Avenues representatives stated that they were excited to work with the Plaintiff and that he was improving the quality and communications tremendously, in such a short period.  They also stated that the organization was disappointed with Mark Hallett and Cathleen Owen and the way they managed the quality unit.  Similar statements were made by Biersdorf's employees, where Tri Tech did not complete the Corrective Action needed to begin the phases of product transfer until the Plaintiff managed the process.

The Defendant is in internal conflict regarding its written and implemented progressive discipline policy, as to the existence of or non-existence of such a policy.  In its letter to the Plaintiff dated June 10, 2010 at paragraph 3, Defendant states "..Thus, the reality is that while Tri Tech does not have any process which mandates progressive discipline as you suggest, even if this had been the case, the seriousness of your performance issues required the actions taken against you" and later states to the [EEOC] in paragraph 2, "...Respondent denies all allegations and asserts that they will generally take action in a progressive manner."  The conflicts in application written and well-established reveals an internal struggle and indicates a potential pattern of inconsistent treatment and unequal and unfair treatment as is evident on the fact of the Plaintiff's complaint.

Defendant has adopted written handbook denominated as Tri Tech Laboratories, Inc. Employee Handbook, where it outlines and states, "The Company has adopted a progressive discipline policy to identify and address employee related problems." In its written handbook it provides guidance for its probationary period that is twenty-eight (28) days in length to evaluate its new hire employees where it states in its Discipline/Discharge policy "Probationary employees are held to the highest standards of behavior and job performance.  Progressive Discipline is the exception rather than the rule for probationary employees."  It further outlines the policy stating, "Tri Tech will normally adhere to the following progressive disciplinary process: 1) Informal Discussion, 2) Verbal Warning, 3) Written Warning, 4) Suspension, and 5) Termination.

Due to Defendant's wrongful implementation of its written and accepted programs

and practices, Plaintiff was terminated without consideration or even acknowledgement of an opportunity to correct any performance gap that might have been present or even a written list of duties, tasks, and expectations, while Caucasian employees have performed far less poorly than Plaintiff could ever perform, even if Defendant's allegations were true, and have been granted access to the progressive discipline program and even to extreme measure of progressive discipline not listed on its written policy, outside counseling.

As direct and proximate cause of the actions of the Defendant, Plaintiff has been terminated and denied employment terms and conditions and privileges of employment due to his race in violation of 42 U.S.C. § 2000(e) et seq., and 42 U.S.C. § 1981 and has no other recourse but to file suit.  He is entitled to equitable relief for the amount of pay he would have earned but for the discriminatory actions by the Defendant.  Plaintiff seeks compensatory damages for the mental anguish and distress, embarrassment, and humiliation that he suffered as a result of racial discrimination by Defendant.  Plaintiff has been damaged by the intentional acts of the Defendant and is therefore entitled to relief of the Court.

Plaintiff has included Exhibit "F", email correspondence with racial overtones and harassment, and Exhibit "G", weekly highlights submitted to manager for performance. . . .

The "Exhibit 'F'" to which the complaint refers is a chain of e-mails, beginning on Wednesday, April 21, 2010, with a message from Blake Hemmel to a person named Khanh Severino, to whom Mr. Hemmel provided a tracking number.  Khanh Severino responded to Mr. Hemmel (and apparently copied the response to others) as follows: "Just got the package so I will be reviewing them.  I will be away from the office next week so I will have to send it to you on Monday 5/3."  Mr. Hemmel then forwarded the e-mail to Tri Tech employees Mark Hallett, David Warren, Cathleen Owen, Theresa McGuire, and Rhonda Seay, including the following message: "THANK GOD!  A WEEK OF PEACE AND QUIET!"  Several messages between these persons ensued, including the statement, "That woman is a menace!" and, at least in the document provided by Plaintiff, concluding with an e-mail message from Mark Hallett to the others that simply stated, "She's Viet Nam's revenge."

The "Exhibit 'G'" to which the complaint refers appears to be two pages of notes, entitled

"Weekly Highlights," that Plaintiff compiled regarding work he had been doing.

Soon after filing the complaint, Plaintiff filed a "Motion to Strike Defendant's Affirmative Defenses and Answer, and in the Alternative, Motion for Summary Judgment," which I denied by memorandum opinion and order of May 15, 2013.  In support of its response in opposition to Plaintiff's motion, Defendant submitted the "Affidavit of Steven Fullerton," who was president of Tri Tech Laboratories, Inc. at that time and had been since October 2007.  The affidavit, which has also been submitted among the exhibits in support of Defendant's summary judgment motion, is quoted here, in pertinent part (paragraph numbering omitted):

> David Warren was employed as the Technical Director of Quality Assurance up until the time of his termination in May 2010.
>
> The Technical Director of Quality Assurance is ultimately accountable for issues of product quality and customer dissatisfaction.
>
> During Warren's tenure, Tri Tech received multiple complaints about Warren's performance, both internally as well as from Tri Tech's customers.  Two events, in particular, led to Tri Tech's decision to terminate Warren's employment.
>
> Warren, as the Technical Director of Quality Assurance, was assigned to lead an investigation into an FDA-regulated drug product that had incorrect labels on them.  The investigation dragged on to such an extent that the customer in question would call daily inquiring as to when the product would ship.
>
> Following a visual inspection of all products, Warren recommended that the products be shipped out.  Importantly, even one mislabeled unit could trigger a recall.  Doubtful of the accuracy of a visual inspection, Mark Hallett ("Hallett"), Senior Director of Quality, ordered an electronic re-inspection of the products, which uncovered 2,268 additional units with the wrong back label on them.
>
> The investigation was assigned to and spearheaded **solely** by Warren, by virtue of his position at the Company.  Warren's choice to disregard recognized laboratory procedures and instead incorporate visual inspection of the product labels directly resulted in the drawn-out and ultimately unsuccessful management of the quality issue in question.
>
> The second major event behind Warren's termination involved an olfactory issue that affected several hundred thousand units from Tri Tech's largest client.  Tri

Tech and the client conducted a joint investigation, and Warren, as Technical Director, was once again asked to lead the investigation on behalf of Tri Tech.

During his investigation, Warren pursued a single theory of what had created the off-odor, and conducted testing in an attempt to discover the root cause. Ultimately, his single cause theory of the off-odor was proven wrong.

During his investigation, Warren failed to record his data, did not communicate his plans or the results adequately internally or with the client, and otherwise failed to conduct his investigation in compliance with good laboratory practice; something he should have been and claimed to have been familiar with. In fact, Warren's failure to communicate with the client resulted in the client flying two of its investigation teams, at substantial expense to the client, out to Lynchburg, Virginia to complain about Warren's performance and lack of communication.

As the person directly responsible for leading the investigation on behalf of Tri Tech, this behavior was unacceptable. No other Caucasian employees were staffed with leading the investigation into the olfactory issue. The management of the investigation on behalf of Tri Tech was solely the responsibility of Warren. Once again, Hallett was forced to step in and take over the management of the olfactory issue, which was ultimately corrected under Hallett's leadership.

I was personally involved in the decision to terminate Warren's employment at Tri Tech. Warren's race played no role in the decision to terminate him from employment. Tri Tech hired Warren knowing he was African American.

Additionally, the Caucasian employees listed by Warren in his Complaint and his Motion for Partial Summary Judgment were not similarly situated as Warren, and thus, are not proper comparators to show disparate treatment. Stated simply, discovery will show that these employees did not engage in the same type of misconduct/poor performance as Warren which resulted in Warren's discharge.

## III.

The summary judgment record discloses the following facts.

Defendant, Tri Tech Laboratories, Inc., is one of four companies owned by Knowlton Development Corporation ("KDC"), and is a contract manufacturer of personal care and health and beauty aids. During the time relevant to Plaintiff's claims, Defendant's largest customer was Beauty Avenues, of which Bath & Body Works is a division. Some of the products

manufactured by Defendant – including some of those manufactured for Beauty Avenues – are regulated by the Food and Drug Administration ("FDA").

As previously stated, Steve Fullerton was the president of Tri Tech during the time of Plaintiff's employment there.[4]  As president, Fullerton had overall responsibility for the plant, and maintained relationships with the top executives of Defendant's customers.   One of Defendant's senior management officials, reporting directly to Fullerton, was Mark Hallett, who was the Senior Director of Quality Assurance.[5]  In turn, Plaintiff reported to Hallett, who hired him.

Sherry Stone was Defendant's Director of Human Resources and Safety.[6]  Stone oversaw all of Defendant's human resource functions, and she was knowledgeable about the facility's human resources policies and procedures.

Cathleen Owen is the Corporate Director of Regulatory Affairs and Compliance for Defendant's corporate parent, KDC.  She was formerly Defendant's Director of Quality, prior to her 2009 promotion to KDC.  Her job at Tri Tech was the same or similar position Plaintiff held during his employment with Defendant; indeed, it was her promotion to KDC that opened the position for which Plaintiff was hired.   Fullerton testified that, after Owen was "appointed director of corporate quality for our parent company," she still "resided in our office and was still playing a key role at our location."

During Plaintiff's employment, Defendant employed approximately 400 people, and of

---

[4] In deposition testimony, Mr. Fullerton stated the following: "When I started with Tri Tech in 2000, I was executive vice president and chief financial officer, and I stayed in that rule until November 2007 when I was appointed as president."  He also testified that he is no longer employed by Defendant.

[5] Hallett testified that he is no longer employed by Defendant.

[6] Stone testified that she is no longer employed by Defendant.

those, approximately 60% were minority.   Defendant had, and continues to have, a non-discrimination policy, which includes a prohibition against race discrimination.   The policy is found in Defendant's employee handbook, and it is titled "Equal Employment Opportunity" ("EEO Policy").   Every employee, including Plaintiff, was provided a copy of the handbook. According to the EEO Policy, any employee who believed there was discrimination could complain to the Human Resources Department, or Defendant's president, or others.   Plaintiff made no complaint during his employment with Defendant.

As I have already observed, Defendant opened the position into which Plaintiff was hired, Technical Director of Quality Assurance, when Owen was promoted to KDC.   Several external and internal candidates were interviewed.   Plaintiff was interviewed by telephone and was then brought to Lynchburg from Texas for a face-to-face interview with several managers.   Plaintiff is African-American; the other finalist for the position was an internal candidate, Blake Hemmel, who is white.   Hallett decided to hire Plaintiff, and this decision was supported by others, including Owen, who participated in the screening and interviewing of the external candidates. By letter dated December 23, 2009, Plaintiff was offered the position.

Plaintiff was living in McKinney, Texas when Defendant hired him, and he apparently lives there now.   As Plaintiff learned in the interview process, the job required Plaintiff to relocate to Lynchburg.   Although Plaintiff was offered employment in December 2009, he did not begin working for Defendant until February 2010.   The December 23, 2009, letter from Stone to Plaintiff stated, in pertinent part:

> This will confirm our offer of employment for the position of Technical Director at an annual salary of $97,000, plus a potential annual bonus based on annual salary. Bonuses are determined based on the performance of the company as well as individual performance.   You will report to Mark Hallett, Senior Director of Quality Assurance.    This offer is contingent upon the satisfactory results of a pre-

employment drug screen and background check.

As a full time employee of Tri Tech, you will be entitled to our comprehensive benefit package that includes: life insurance, medical insurance, dental insurance, disability coverage, and a 401(k) savings plan.  In addition, you will be given three weeks of vacation.

We are offering you reimbursement of relocation expenses for your move from McKinney to Lynchburg.  In addition, we will reimburse expenses for one trip to Lynchburg while searching for your new home.  If needed, we will also provide up to seven month's [*sic*] rental assistance while you are searching for your new home. . . .  If before the completion of one year of employment you voluntarily leave Tri Tech Laboratories, you must repay the above relocation expenses.

*It should be understood that this letter does not constitute a contract of employment or promise of employment for a definite term and either party may terminate the employment relationship for any reason at any time.*

(Emphasis added.)  Plaintiff signed the letter, indicating his acceptance of the offer, and returned

it to Defendant.

Stone testified that at-will employment was standard practice at Tri Tech, and the

employee handbook states, under the sub-heading "NATURE OF EMPLOYMENT," that

[e]mployment with Tri Tech is entered into voluntarily and is at-will.  This means an employee is free to resign at any time, with or without reason, and Tri Tech may terminate the employment relationship at any time, with or without notice of reason.

Neither the policies set forth in this handbook nor any other policy of Tri Tech is intended to create a contract of employment for any specific duration.  The provisions of the handbook have been developed by the discretion of management and, except for the policy of employment-at-will, may be amended or cancelled at any time, at Tri Tech's sole discretion.

Plaintiff's responsibilities were identified and provided to him in a job description

prepared by Hallett.[7]  Plaintiff did not raise any concerns with Hallett as to what his job required

---

[7] Plaintiff asserts that the job description is "fictitious" and "fraudulent," not because it inaccurately describes his position, but because the date on the job description, June 2, 2009, precedes Hallett's employment with

(continued...)

him to do.   The job description specified the following "Primary Responsibilities/Accountabilities":

> Assist the organization with the development, implementation, management and continual improvement of an effective quality assurance program.  Serve as a regulatory resource to the organization by providing input and opinions that are in compliance with applicable rules and regulations.  Manage and drive systems to closure that are already established within the quality program.  Serve as a role model for company values and culture, consultant for internal/external customers on compliance and regulatory issues.

> • Lead the day to day activities of the Quality Assurance Departments to support the smooth flow of production through the facility.  Establish appropriate performance metrics for each group and for Production (i.e.: Analytical Lab, Micro Lab, Validation/Calibration, Document Control, Release/Records, Incoming Inspection, In-Process Inspection).
> • Continually improve product quality and client satisfaction by strengthening the company's Quality Management System and documentation consistent with FDA's QSRs and ISO guidelines, especially CAPA.
> • Lead investigations of product quality issues, non-conformances, COS events, and document those findings.  Inform senior management of product quality issues in a timely manner, and report investigation findings and corrective and preventative actions clearly and concisely.
> • Initiate and approve senior level quality system documentation, such as validation protocols and reports, standard operating procedure, client quality agreements, change control requests, etc.
> • Develop a Quality Department structure (organization and systems) that creates a culture of success and precision of execution.  Ensure all department employees are current in their documented GMP, GLP and job specific training.
> • Establish and direct training and continuing education programs (both internal and external) regarding GMP and other regulatory requirements.
> • Contribute to the overall success of the company by aintaining a collegial relationship with all levels of management.

The job description specified the following under the sub-heading "Education and Experience":

---

[7](...continued)
Defendant, which began in July 2009.  Defendant admits that the date is erroneous.  However, as explained in Hallett's affidavit, that date reflects a simple drafting mistake, as Hallett created the job description in September 2009 using as a template a previous job description prepared by someone else, and he forgot to change the date on the new job description.

- BS degree in one of the life sciences and/or 10+ years experience in related field.
- Experience working in a highly regulated industry (laboratory, devices, pharmaceuticals or biologics),
- Experience in a laboratory and/or in a GMP environment.
- Knowledge and experience with laboratory instruments and equipment, test methods, documentation requirements, etc.
- Knowledge and experience with regulatory/accreditation agencies.

The job description also specified the following "Knowledge, Skills, and Abilities":

- Excellent organization skills.
- Excellent written communication skills including writing, editing and proofreading.
- Excellent oral communication and facilitation skills.
- Excellent interpersonal skills.
- Ability to maintain confidentiality.
- Ability to be self-directed with strong work ethic.
- Ability to communicate effectively with TTL ["Tri Tech Labs"] Management at all levels.

Owen testified that she had reviewed "the document as it had been written up to be sure that it covered all the different aspects of the job," and that the job description reflected what Plaintiff's "job would have ultimately become once he had been in the position long term enough. He did not have immediate responsibilities for validation and document control. Those two areas continued to report to me." Owen explained that she "maintained the reporting relationship with the validation and the document control group until he had fully transitioned into the position."

Within months of hiring Plaintiff, Defendant terminated his employment because he was not satisfactorily performing his job. Hallett determined that Plaintiff was deficient in most of the bullet points itemized in the job description, and then Hallett learned that Plaintiff was preparing to relocate his family from McKinney, Texas to Lynchburg. Rather than have Plaintiff face termination after moving his family, Hallett fired Plaintiff on May 28, 2010, with

-15-

Fullerton's blessing.  The decision to fire Plaintiff was finalized after a meeting on May 28, 2010, between Plaintiff, Hallett, and Stone, where Plaintiff provided no assurance that he would try to correct his performance issues, a catalog of which follows.

In 2010, Bath & Body Works was about to re-launch several hundred products, and one fragrance was the premiere fragrance for several product lines.  Defendant shipped several products to Bath & Body Works with the one fragrance, and the customer reported that the fragrance did not have the correct smell.  Plaintiff was assigned the task of leading an investigation to determine the cause of the problem.

During the investigation, Plaintiff focused on his theory of what he thought was the problem.  Hallett testified that Plaintiff

> thought that the fragrance issues was attributable to the pH of the product.  And I didn't know enough about it chemically myself to make that judgment.  So I was as open to his thinking as I was to anybody else's.
>
> But people who knew more about formulation felt that that was not the case, that it would – we would find that it was attributable to something else.

Plaintiff focused on his theory to the exclusion of other theories, did not use scientific methods, and did not discover the cause of the off-scent problem, which turned out to have been caused by the supplier of the fragrance, and did not have anything to do with Defendant.  In any event, Plaintiff's performance during the investigation was unacceptable to Defendant because Plaintiff refused to keep the customer, Beauty Avenues (of which Bath & Body works is a division) informed and, as a result, the customer's representative flew to Lynchburg to discuss the issue with Tri Tech management and to express the customer's displeasure with Plaintiff's management of the situation.

On May 25, 2010, representatives of Beauty Avenues sent an e-mail conforming that the

visit was set to take place the next morning, stating that the investigation was the customer's "top priority" and that the launch of the product, which was emitting the off-odor, was "critical to [its] business."   While the customer's representative was en route to Lynchburg, Hallett gathered his team, which included Plaintiff (and Hemmel and Owen "and a few others"), to discuss what the team's next strategy would be, given that Tri Tech necessarily would need to be prepared to explain its strategy to the customer.   Plaintiff had no answer.

Hallett provided the following deposition testimony:

I got them together and said "Okay, you know, the client is inbound on their plane and they'll be here in an hour.   What are we going to tell them?"   And my question was directed to David because I'd asked him to oversee this investigation and study and follow the procedure.

And at that point David, you know, hesitated before saying that he really didn't have a strategy, he didn't have an answer, he had no strategy for dealing with the client when they got there, and that . . . he didn't know what our next step should be.

And as I say, he repeated that several times to the point where I knew nothing would be forthcoming.   So I took over the discussion and I dismissed most of the people in the room

I gathered a subgroup in my office and put together a short-term plan to deal with the client when they got there, which we did effectively.   In the sense that while we didn't have an answer – a definitive answer as to what caused the problem, we showed them that we had eliminated at least one problem, which was pH, but that we had other steps underway.

And their team leader said to me, "Well, okay, that's fine, we understand. We understand it was a complex issue and it may or may not have resided or begun at Tri Tech, so we understand that there's a long process here."

But she said to me, she said, "I also want you to know that we're very concerned about David and his performance."

And I said, "In what way?"   And both of these first two bullet points were for the same client, and that would be Beauty Avenues, our biggest client at the time.

-17-

And so when our biggest client says they have a concern about your technical director, you know, that gets attention.  So I discussed that with her and she suggested strongly that David was not the person to be running technical investigations on chemical issues.

And she was annoyed – so that's the professional side, but she was also annoyed that, you know, she had given David her cell phone number so that he could keep her updated throughout the weekend and he had not done that, according to her.

Q:  What is the name of that person that you're [*sic*] talked about?

A:  Kelly Reed.

Q:  What was her title?

A:  She was the director of quality for Beauty Avenues.  I believe she's now vice president of quality over there.

During the meeting on May 26, 2010, Reed also expressed her displeasure to Fullerton and

Owen.  Fullerton gave the following relevant deposition testimony regarding his interaction with

Kelly Reed:

I believe her position was somewhat like quality manager . . . [f]or Beauty Avenues.  So she was in a management role.  She was sitting in our conference room, and as always, I went in to check on her, see if she was happy and how things were going and how she was doing.

When I walked in and said to her something lie, this isn't verbatim, but how's it going, she said something like not so good or not very well, and of course that bothered me that our customer was not happy so I sat down next to her and asked her what she was not happy with.

And she specifically said, again not verbatim, but the intent of her message what she was not happy with David Warren and the approach he had taken and his – something to do with his approach towards this issues and his expediency with dealing with it.

Owen testified that Reed expressed "her concern over the lack of follow-up and how

difficult it was to get in touch with Mr. Warren," that there had been a "lack of follow-up with

sufficient details to make them feel comfortable with what the progress was related to

-18-

investigations and projects that were going on," and that Reed found "that it was very difficult to get in touch with Mr. Warren, leaving messages, leaving e-mails and just being able to communicate with him."  Because of Reed's concerns, Owen told Reed that she "was personally getting involved on a corporate level to assist with this investigation."

That evening, Reed's complaints prompted Hallett to e-mail Fullerton.  The e-mail, headed by the subject line "Organization" and bearing a sensitivity marker of "Confidential," stated, in pertinent part:

> I just learned David Warren plans to move his family here next week.  David's performance/contribution level has not met expectations, either mine or of the group in general.  He's a very likeable guy, but he can't do many of the things he told us he could during the interviewing process.  Most importantly, he can't multi-task, a necessity here.  Kelly brought up David's lack of responsiveness to them in today's discussions.  I've had a number very direct conversations with David over the last few weeks letting him know he's not succeeding in this environment, and the he's disappointing his counterparts.  Now, it seems, out largest customer as well.  If you approve, I'll advise him tomorrow not to relocate his family until he gets his contribution up to expectations, although I think if he could he would have done so already.
>
> Alternatively, if you think I shouldn't wait for the inevitable and should cut him loose, I'd propose doing that tomorrow after Kelly leaves.  I'd then move Blake up to the Director position and continue searching for a QA Manager (replacement for Mack).  Blake has done an excellent job fixing the lab operations and building credibility with BA, Kao, and BDF.  I'm convinced he can handle both sides of Quality.
>
> Again, I'm sorry for springing this on you on short notice, but things have intensified/deteriorated with David yesterday and today.  If you have a minute I can give you more details.

Two days later, on May 28, 2010, Plaintiff's employment with Defendant was terminated.

The incident occurring around May 26, 2010, when Reed complained about Plaintiff's performance, was not the first time Beauty Avenues had expressed concerns to Defendant about Plaintiff's performance.  Prior to the off-scent issue that arose just before Plaintiff was fired,

-19-

there had been a problem when several hundred thousand bottles of FDA soap had been placed on hold because of incorrect labels. Plaintiff was assigned the task of inspecting the bottles so that product that had been correctly labeled could be released to Beauty Avenues for sale to the public. Rather than inspecting the labels electronically, Plaintiff assigned employees to visually read the tiny print (approximately a size 4 font) on the labels to see which bottles had been mislabeled. Plaintiff's method incurred extra costs to Defendant, and caused delays to the point that Beauty Avenues checked at least once a day in an attempt to ascertain when the product would be released. Eventually, Plaintiff authorized the release of the product, but without adequate documentation. Hallett was so worried over the matter that he had the bottles re-inspected electronically, and found that over 2,000 bottles that Plaintiff was prepared to release were mislabeled.

Beauty Avenues expressed its dissatisfaction. Fullerton testified that he received a call from Marlene Manser, the administrative vice president of operations for Beauty Avenues. He stated that

> [s]he was very frustrated that that product had not shipped, that it was taking too long; that she was aware of the quality problem but felt that it was taking too long to get that product and they were in desperate need of that product.

> Q: Did she mention Mr. Warren by name as far as any issues with him?

> A: She did. She mentioned to me that their quality department had expressed that they were not happy with David's work, especially related to this particular issue.

Another of Defendant's customers, Beiersdorf, a large German company that makes products such as Nivea and Eucerin, also complained about Plaintiff. At the time, Beiersdorf was a new client for Defendant. Beiersdorf had closed a plant in Connecticut and was transferring equipment from the closed plant to Defendant in Lynchburg for the purpose of the

new business venture.  Plaintiff was given responsibility for coordinating the transfer of the equipment, but continually failed ("for at least four weeks in a row," according to Hallett) to timely provide a schedule for the transfer of the equipment, which prompted Beiersdorf to complain to Fullerton about Plaintiff.  As Hallett described the Beiersdorf equipment transfer, "[I]t was an embarrassment to me, it was an embarrassment to Tri Tech.  We're, as I said before, noted for exceeding expectations, not being behind the curve, so it was an embarrassment."

There had also been internal complaints about Plaintiff.  Theresa McGuire was Defendant's Director of Customer Service.  Hallett testified that McGuire had "frequent conversations" with him regarding McGuire's belief that Plaintiff's performance was deficient. Additionally, Owen testified that she complained to Hallett about the lack of information and details Plaintiff provided:

> Q: All right.  How about Mark Hallett, did Mark Hallett – did you have conversations with Mark Hallett about David Warren's performance?
>
> A: I did, but they were facilitated by me.  I went to him and explained that I was concerned, that upon asking David for information around investigations and projects that he was participating on, I asked him what the updates were, and consistently the response I received from him was, "I got it, I got it."  And when I asked him, "What have you got?" – or, "What do you have?" he said – it was basically, "Don't worry about it.  It's all under control."  It was very dismissive.
>
> I was willing to give him some leeway to show that he actually had it under control.  But when I was lacking in details I finally went to Mr. Hallett and told him that I was genuinely concerned about what we did not know around these investigations and what was going on.

According to Owen and Stone, Owen also expressed her concerns about Plaintiff to Stone.

Owen also received complaints about Plaintiff from other employees.  One complaint involved missing documents, specifically "change control requests, which are about the routing of procedures around the facility."  Plaintiff denied having any of these documents, although at

least one of them turned up later, when Plaintiff's office was inventoried on the day he was fired. The inventory disclosed numerous other missing documents, including those which employees had unsuccessfully searched for, and asked Plaintiff about, during Plaintiff's employment. Significantly, original documents were found in Plaintiff's office.  Owen was particularly concerned about the originals because of the potential for loss and chain of custody issues, as retention of the documents was important for FDA regulatory review, while at the same time, the documents were actually the property of the customer, and were kept under Defendant's stewardship for ease of reference.

The record includes a documentation of the inventory, titled "Items Recovered from David Warren's Office May 28, 2010."  The following 27 items are listed in the inventory; the asterisked items indicate that "[m]ultiple requests [were] made to D. Warren for this information or paperwork":

1. J. Hester's annual performance review due April 17.  Not started.
2. J. Williams' annual performance review due April 20; done by Brandi; Not approved by David.
3. A. Birdsall interview notes.  Not circulated.*
4. Change Control Request.  Last signature 4/27/10.  Not completed; returned for investigation.
5. 2 LAN communication cards for the HPLC's, received 4/26, still unopened in their boxes.
6. Lab Investigation Reports #150, 154 from 3/15, 3/16 by Blake to David; not reviewed/approved.
7. Resume and unsigned requisition for J. Casey.*
8. Resume for Famarra Jotta.
9. Original filing process order #1021886, 3/6/10.
10. Twilight Woods green card, 1st production batch (color, odor, appearance signed off).
11. Multiple cartons containing several dozen original product retains.
12. Original 2009 hose logs and C&S logs for T16, T11, T12, T9, T7, others.
13. Full deck copies of multiple process orders – Stack 18" high.
14. Box of 1z White Citrus DCHS neck bands and UPC labels returned from Canada rework.  Not re-entered into inventory.
15. Original test reports for PO 10210781.*

16.    MAP Team notes for meetings DW did not attend.
17.    Purchase Requisition for Bruker Optics NIR 3/9/10.  Never processed.*
18.    Missing Agilent IQ/OQ/PQ.*
19.    SOP QM P 12 Customer Complaint handling.* This was a critical SOP that was reported lost.
20.    Chromatography assignment from C. Owen.*
21.    Karl Fisher Purchase Requisition, Agilent quote.*
22.    Quote from Avery to M. Rhoden on label equipment update project.  Label room status requests.*
23.    Original Hold Report 10-272, 3/15/10.
24.    Vision System PQ protocol needed by 2/10/10.*
25     Original FID, no number, 4/28/10.  Art signed 5/5/10.
26.    Original investigation report % ethanol in OTC batches duplicating investigation by C. Owen.
27.    Purchase Requisitions unprocessed for incoming inspection equipment for BDF components.

As the inventory shows, Plaintiff failed to perform his basic supervisory functions, such as starting the paperwork for employee reviews.  Hallett testified that, in some cases, this caused the delay of pay raises.  Regarding the inventory, Hallett testified that "there were product-specific documents there and protocols and other regulatory documents that were needed and had been – we'd been searching for weeks and they were in his office."

Other employees complained that Plaintiff would not sign-off on critical regulatory documents so products could be released.  On one occasion, Owen signed the documents herself.  Hallett testified that, distinct from the documents found in Plaintiff's office after he was fired,

[c]ertificates of analysis [or "C of A"] are documents that are issued by the laboratory that say all of these specifications that are required to be met to release this – these products have been met.  They need to be signed.  It's a – it's an elaborate FDA process.

David was the signatory on this.  Cathleen Owen had been in her former role as quality director, and now, you know, that was called technical director.  But David had three months' worth of C of As in there.  We knew they were there.  These were not the documents I was talking about before that we found after he left, we knew they were there.

And so Blake, to some degree – you know, Blake worked for David,

> reported to David, so he had to be a little bit circumspect, but Cathleen and I kept an eye on that pile of documents to see if it was growing or shrinking and whether any progress was being made.  And we would ask him from time to time, at least daily, you know, are you going to sign this?  When are you going to sign them?  You've got to sign them because we've got to release the products.
>
> And I remember this vividly, it was a Friday afternoon, and David had – had left and Cathleen came to my office and said, "Those documents are still there.  You know as well as I, we need to ship those products.  Do you want me to capture those documents and sign them if they're – if they're acceptable, sign and release those products?"
>
> And I said, "Yes, go ahead and do that."
>
> So the fact that – again, the fact that David didn't seem to understand the impact of his actions or inactions on the operation and on our commitment to our clients, our customers, on the commitment to the Government, you know, it – it startled us from time to time.

Owen's testimony described the scenario in similar terms, adding that Plaintiff "didn't see the importance at all."

There were internal complaints about Plaintiff's unilateral attempt, without any discussion and without any approval by upper management, to change processes that Defendant had used for many years.  As Owen testified, Hemmel

> had been out of the office, and therefore, David was covering for him, taking care of the lab employees.  And he had given them a directive about testing finished goods from the quality control lines that was not part of our current operating procedures.  We really didn't have the appropriate staff in place.  And he gave it as an ultimatum to be immediately follow and, unfortunately, the lab employees were at a loss as to how to do it.
>
> * * *
>
> In addition to the fact that it's in direct violation of what the procedures say, and he didn't take the time to change the procedures before doing it[,] . . . if we don't follow the procedures as they're written, then it can be an opportunity for an FDA observation during an audit.

According to Hallett, the response from other employees to Plaintiff's unilateral decision to

-24-

change the production processes was "immediate," "loud," and "disapproving," and "would have shut down the entire facility."  Hallett testified that Plaintiff's "decision didn't make sense.  And it was enough for me to just override it and send out another e-mail saying, 'Yeah, that went out in error,' you know."

In some cases, Plaintiff's decisions, *e.g.*, a decision to release a product that contained "superpotent" levels of triclosan for a specific product, would have been in violation of FDA protocol.  In another instance, Plaintiff made a decision that demonstrated his lack of technical knowledge, as he questioned the government-approved method for testing alcohol content. Hallett 64-66.

The record reveals an undercurrent beneath all of these issues:  Plaintiff demonstrated an apparent lack of technical knowledge and comprehension of (or respect for) basic regulatory and safety issues.  In one case of "superpotency," Defendant had produced a batch of product that was "nonuniform," *i.e.*, there was too much of an ingredient in the batch, which could cause harm to the consumer.  Plaintiff nonetheless recommended the release of the product to the customer, who would then put the product on the consumer market.  The product was not released, but according to Hallett, he and others were "shocked" by Plaintiff's recommendation:

> I can tell you that Cathleen Owen and Blake Hemmel and I, number one, were shocked that anybody who had any experience in a laboratory or in an FDA-regulated environment would make a recommendation like that.  And we were also shocked based on David's presentation of himself during our interviewing process that he would not understand the concept of superpotent or subpotent drugs and the impact that those could have.
>
> The fact that a quality professional would suggest releasing that – if this were a heart medicine and the FDA found that out, you would go to jail.  I mean, it's a serious problem.  So were shocked on both of those levels that, number one, he would recommend that; and number 2, that he didn't understand sub- and superpotency.

Owen testified that she

> explained to David that it is just as illegal to distribute a drug product – and that is
> what this is.  It is an OTC, over-the-counter drug product – with too little active
> ingredients and too much.  There's a specification range for a reason.
>
> And he had – made it clear to me that he had never heard of it being an issue
> with a product being what they call superpotent and I explained to him that it is a
> problem and we cannot release it.
>
> Q: Did that surprise you, that he didn't know that a product that's superpotent
> should not be released?
>
> A: It did surprise me.
>
> Q: Would you have figured a person of his, I guess, experience or technical
> background should have known?  Is it something, you know, a normal person with
> his experience and technical background would know?
>
> A: Yes.
>
> * * *
>
> [I]f we had released those items with superpotency it would have been an FDA
> issue.  It could have escalated to a re-call if they had chosen to call it back.
>
> * * *
>
> The biggest impact to our company would be that it would mar our
> reputation and could affect our potential to maintain customers as well as to attract
> new ones.

As I have previously observed, the decision to fire Plaintiff was made by Hallett, the same

person who had hired him just a few months earlier.  Fullerton and Stone were in agreement that

Plaintiff's poor performance justified his immediate termination from employment.  Fullerton

stated that, during his 13 years at Tri Tech, a customer had never before called him to complain

specifically about a Tri Tech employee.  Hallett testified that he had never fielded a similar

complaint.

Hallett prepared a memo, "RE: David Warren's Separation," dated April 6, 2011,

-26-

addressed to Stone, which states, in pertinent part:

> There are many events, both large and small, that led to David and me agreeing his separation would be best for both himself and the Company.  Two stand out particularly.  I can state categorically that none related to his race; all related to his ability to perform his job duties at the executive level we expected, to his relationships with his peers and co-workers, and to his inability to effectively execute his assignments.  I've summarized some of those events below.

> •  Prior to distribution the Quality department discovered finished goods bottles of anti-bacterial foaming hand soap (an FDA-regulated drug product) with incorrect back labels on them.  We put several hundred thousand units on hold, and I assigned David to lead the investigation.  The expected outcome of the investigation was a determination of how the error had occurred, a corrective action plan to ensure it didn't happen again, and management of the internal timeline so that inspected and acceptable product would be delivered to the client transparently and in time to meet their market demand.  The investigation dragged on for several weeks to the point where our client was calling our Customer Service Department at least daily to find out when the product would ship, enabling them to replenish their inventory.  To sort the units and cull the ones with the incorrect label, and against the advice of the Quality Management team, David set up a rework operation in the finished goods warehouse.  He had the employees visually inspect the bottles looking for an extremely small code number on the label identifying it either as the correct or incorrect back label for that product.  David made no provision for recording the results of the inspection.  At the completion of this inspection, David recommended to me that we release the product.  Because of the lack of documentation of the inspection findings, and my belief that electronic inspection is both faster and more effective than visual human inspection, and because this product is an FDA-regulated drug product that even one mis-labeled unit could trigger a recall, I decided to have the material brought to the plant for 100% electronic inspection even though the customer was now desperate for the product.  The electronic re-inspection found 2,268 additional units with the wrong back label on them.  When I confronted David with the possibility that he could have released these drug units in error, he stated that he "just want(ed) this whole thing to go away".  David had jeopardized the Company and our client by trying to release mis-labeled drug product.

> •  During post-shipment testing, our largest client discovered an olfactory issue with their premier fragrance in the moist soap formula, and asked us to put several hundred thousand units on hold while we conducted a joint investigation.  I asked David, in his position as Technical Director, to lead the investigation from our side, and to be the liaison with the client's investigation team.  This situation had significant potential financial and market-credibility ramifications for both us and the client.  David worked

very hard through one weekend pursuing a single theory of what had created the off-odor in only the one product form. He conducted testing across a wide range of manufacturing lot numbers of the product in question in an attempt to identify a root cause of the problem that supported his theory. Unfortunately, ultimately the data he developed did not support his theory; he used non-Chemists to do the testing; he did not record any of the data produced; he did not verify the proper operation of the test instrument throwing the results obtained into question; he did not communicate his plan or the results adequately either internally or to the client. Each of these is contrary to good laboratory practices with which David claimed to be, and should have been, familiar with. The client flew two of its investigation team members to Lynchburg at substantial expense to discuss the investigation and, as it turned out, to complain that David had not provided them with any meaningful investigation status reports. During an internal meeting of the Company's investigation team just prior to the arrival of the client's people, I asked David what his strategy was for explaining our findings to the client when they arrived in an hour. David stated that he didn't have a strategy and that he didn't know what our next steps should be. He repeated this several times before I took over the discussion, dismissed the team, and met with a smaller group to develop a short-term plan. I did not include David in the subsequent meeting with the client's people because I thought he would have had nothing of value to add. Again, as it turned out, the client's people had made the trip so they could let me know in person how dissatisfied they were with David's performance during this issue and the moist soap issue described above. Ultimately, David's single cause theory of the off-odor was proven wrong. A substitution of a chemical raw material used in the batch was identified as the key element in the off-odor.

- David was responsible for preparing a timeline for transferring purchased laboratory instruments from a new client to TTL. He failed to provide the timeline for such a long period that the new client's project manager contacted Mr. Fullerton to get the timeline submitted. This was an embarrassment to the Company and to the department.
- David unilaterally sent out an e-mail to all Quality Department employees stating that effective immediately we would begin testing finished goods straight from the lines. This was a major shift in operating practice. He did this without consultation with those affected, or prior approval. In his memo he asked the Lab staff to just absorb the extra workload.
- David initiated his own investigation of active ingredient levels in two product forms. In each case his conclusions were not supported by compendial regulations.
- During our investigation of a drug batch with active ingredient uniformity issues, David recommended releasing the batch. Discussions with David made it clear he had no knowledge of sub- or super-potency regulations.
- David held almost three months of certificates of analysis for signature while he tried to develop changes to the existing format and document flow. In

-28-

theory, the products represented by these documents should not have been shipped.  After repeated complaints by the Document Control group, another Quality Director physically removed the documents from David's office, signed them on his behalf, and got the system flowing again.   David's actions created significant delays in the processing and filing over the documents, and caused the use of overtime.  It was irresponsible of David to stop a regulatory process without understanding fully how the system worked or the ramifications of shutting it down.

- David engaged in a conversation with a Tri Tech Manager with whom he had worked at another company previously, and stated he was "quite frustrated" with the lack of structure at TTL.  David stated that it "is more than I can keep up with".

Sherry, I'm sure you remember from what turned out to be our final conversation with David that we discussed many more issues regarding his lack of accomplishments, his inability to ramp up to the pace of activities at TTL, and the loss of confidence of his direct reports and peers in his ability to lead and represent the Quality function.

Defendant's employee handbook defines "termination," specifying that "discharge" is in the "involuntary employment termination initiated by the organization."  The handbook includes a section sub-headed "DISCIPLINE/DISCHARGE BY TRI TECH," which includes the following pertinent language (emphasis added):

Each employee has an obligation to observe and follow Tri Tech's *policies and procedures*, including those stated in this handbook.  *Failure to do so can lead to appropriate disciplinary action*.  *Disciplinary action may range from*: verbal warnings; written warnings; suspension; and/or *discharge*.

The company has adopted a progressive discipline policy to identify and address employee and employment related problems.  This policy applies to any and all employee's conduct that the company, *in its sole discretion*, determines must be addressed by discipline.  Of course, *no discipline policy can be expected to address each and every situation* requiring corrective action that may arise in the workplace.  Therefore, Tri Tech takes a comprehensive approach regarding discipline and will attempt to consider all relevant factors before making decisions regarding discipline.

Most often, employee conduct that warrants discipline results from unacceptable behavior, *poor performance* or *violation of the company's policies, practices or procedures*.  However, discipline may be issued for conduct that falls outside of those identified areas.  *Equally important, the company need not resort to*

*progressive discipline, but may take whatever action it deems necessary to address the issue at hand. This may mean that more or less severe discipline is imposed in a given situation.* Likewise, some company policies like sexual harassment and attendance, contain specific discipline procedures.

Progressive discipline may be issued on employees even when the conduct that leads to more serious discipline is not the same that resulted in less sever [*sic*] discipline. That is, violations of different rules shall be considered the same as repeated violations of the same rule for purposes of progressive action.

Probationary employees are held to the highest standards of behavior and job performance. Progressive discipline is the *exception* rather than the rule for probationary employees.

Tri Tech will normally adhere to the following progressive disciplinary process:

1.  Informal Discussion. An employee will participate in an informal discussion when he or she engages in problematic behavior. . . . [A]n informal discussion is mean to alert the employee that a problem may exist or that one has been identified . . . .

2.  Verbal Warning: A verbal warning is more serious than an informal discussion. *An employee will be given a verbal warning when a problem is identified that justifies a verbal warning or* as a next step involving a reoccurring problem previously addressed in Step 1. . . .

3.  Written Warning: A written warning is more serious than a verbal warning. *A written warning will be given when an employee engages in conduct that justifies a written warning or* as a next step involving a reoccurring problem previously addressed in Step 1 or Step 2. . . .

4.  Suspension: A suspension without pay is more serious than a written warning. *An employee will be suspended when he or she engages in conduct that justifies a suspension or* as a next step involving a reoccurring problem previously addressed in Step 1, Step 2 and/or Step 3. . . .

5.  Termination: *An employee will be terminated when he or she engages in conduct that justifies termination or* as a final step involving a reoccurring problem previously addressed in Step 1, Step 2, Step 3 and/or Step 4. . . .

Again, while *Tri Tech* will generally take disciplinary action in a progressive action in a progressive manner, it *reserves the right*, *in its sole discretion*, *to decide whether and what disciplinary action will be taken in a given situation*.

It is clear from the text of the progressive discipline policy that Plaintiff was not subject to progressive discipline before he was terminated because Defendant's employment policies do not *require* progressive discipline.  Moreover, even assuming Defendant's employment policies require progressive discipline, the progressive discipline policy expressly provides for termination at any time without proceeding through any of the preceding steps.  Stone testified that she knew of seven white managers who had been fired by Defendant without the benefit of progressive discipline, and this group included one quality director whose position was similar to, or even a "tad above," Plaintiff's position, and one quality manager who reported directly to Plaintiff.

## IV.

Title VII and § 1981 follow the same analytical approach to claims of discrimination.  *See, e.g., Clement v. Satterfield*, 927 F. Supp. 2d 297, 305 (W. D. Va. 2013) (citing *Gairola v. Com. of Va. Dept. of General Services*, 753 F.2d 1281, 1285 (4th Cir. 1985)); *see also Bryant v. Bell Atlantic Maryland, Inc.*, 288 F.3d 124, 133 n. 7 (4th Cir. 2002) (recognizing that the elements of a discrimination claim are the same under both Title VII and § 1981).  A plaintiff can prove discrimination through either direct evidence or through the burden-shifting scheme of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), and its progeny.  *See Satterfield*, 927 F. Supp. 2d at 305; *see also Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 263 n. * (4th Cir. 2008) (citing *Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004)) (*McDonnell Douglas* burden-shifting applies to claims under Title VII and § 1981).

Direct evidence of discrimination is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment

decision." *Washington v. Kroger Ltd. Partnership I*, 2012 WL 6026138, at *3 (W. D. Va. 2012) (citing *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006)).   As there is no allegation in the complaint that suggests any direct evidence of race discrimination, and there is no such evidence in Plaintiff's subsequent submissions, Plaintiff's claims must be approached using the burden-shifting framework set forth in *McDonnell Douglas*.

Under *McDonnell Douglas*, Plaintiff must first establish a *prima facie* case of discrimination. *See Texas Dept of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *McDonnell Douglas*, 411 U.S. at 807.   To demonstrate a *prima facie* case of discrimination, Plaintiff must show that:

> (1) [he] is a member of a protected class; (2)[he] suffered adverse employment action; (3) *[he] was performing [his] job duties at a level that met [his] employer's legitimate expectations at the time of the adverse employment action*; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class.

*Hill v. Lockheed Martin Logistics Mgmt*, 354 F.3d 277, 285 (4th Cir. 2004) (emphasis added) (citation omitted).   If Plaintiff makes this showing, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id*.   If the employer can do so, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the employer's stated reasons are a pretext for unlawful discrimination. *Id*.

The evidence in this case, as reviewed at length above, is overwhelming: at the time of his discharge, Plaintiff was not performing his job duties at a level that met Defendant's legitimate expectations.

Several employees, including Hallett, Plaintiff's former supervisor, and Fullerton, Defendant's president at the time of these events, testified that Defendant's largest customer, Beauty Avenues, and an important new customer, Beiersdorf, had complained on a number of

occasions about Plaintiff's performance.[8]   Plaintiff cannot establish a *prima facie* case of discrimination in circumstances where there have been customer complaints about the employee. *See, e.g., Arrington v. E.R. Williams, Inc.*, 490 Fed. Appx. 540, 544, 2012 WL 3104853, at *3 (4th Cir. 2012) (plaintiff could not show that his performance was meeting employer's legitimate expectations when, among other things, customers had complained about his performance); *Outlaw v. Regis Corp.*, 525 Fed. Appx. 501, 502, 2013 WL 2349788, at *1 (7th Cir. 2013) (affirming summary judgment given that plaintiff had "failed to make out a prima facie case because customer complaints showed that she was not meeting [her employer's] legitimate job expectations"); *Wilkins v. Rockland Industries*, 1995 WL 661118, at *4 (D. Md. 1995) (plaintiff could not establish a *prima facie* case where employer had "received numerous complaint[s] . . . from its biggest customer," and "[s]everal of these complaints specifically mentioned plaintiffs").[9]

And, as thoroughly set forth above, there is abundant, undisputed evidence that other employees complained and expressed concerns about Plaintiff for a variety of reasons – including missing paperwork, unfinished regulatory paperwork, the changing of processes within the facility without approval – and a number of these issues raised significant doubts about Plaintiff's technical expertise.   As with the customer complaints, these issues and doubts

---

[8] The last of the complaints compelled Hallett to decide on that very same day that, rather than "wait for the inevitable," Plaintiff's employment should be terminated before he had gone to the trouble and expense of relocating his family from Texas.

[9] Plaintiff contends that Beauty Avenues' complaints about his poor performance are somehow irrelevant because, in his view, Beauty Avenues had problems with Defendant even before Plaintiff's employment with Defendant.  However, Beauty Avenues' evaluations of Defendant (called "scorecards") show that Defendant's performance improved from 2008 to 2009, and Beauty Avenues felt that – prior to Plaintiff's employment – Defendant's particular strengths were "[c]an easily be reached with open communication" and "[q]uick turnaround time in replacing rejected/reworked products."  In sum, the areas in which Beauty Avenues gave Defendant compliments in 2009 were areas in which Plaintiff's performance subsequently was sub-standard.

likewise prevent Plaintiff from showing that he was meeting Defendant's legitimate expectations, and therefore he does not prevent a *prima facie* case of discrimination.  *See, e.g., Parish v. Siemens Medical Solutions USA, Inc.*, 429 Fed. Appx. 216, 218, 2011 WL 1750290, at *2 (4th Cir. 2011)[10]; *Arrington*, *supra*, 490 Fed. Appx. at 544, 2012 WL 3104853, at *3 (affirming summary judgment; plaintiff could not show that his performance was meeting employer's legitimate expectations when, among other things, "subordinates [had] lodged complaints about [plaintiff's] job performance"); *Williamson v. Carolina Power & Light Co.*, 856 F. Supp. 2d 757, 762-63 (E. D. N.C. 2012) (employee could not establish *prima facie* case where she was late or did not complete assignments and paperwork), *aff'd.*, 486 Fed. Appx. 374, 2012 WL 5374170 (4th Cir. 2012); *King v. Chubb & Son*, 2013 WL 704764, at *6-7 (M. D. Fla. 2013) (no *prima facie* case of age discrimination where "[t]he undisputed record establishes that King's position was eliminated because she failed to demonstrate that she possessed the competency to handle" the job); *Sayibu v. University of Texas Southwestern Medical Center at Dallas*, 2010 WL 4722039, at *3 (N. D. Tex. 2010) (no discrimination where employee lacked the expertise necessary for the job; "[a]s set forth in detail at the summary judgment hearing, the record in this case is "suffused" with evidence indicating Sayibu was not qualified to be a first-

---

[10] The United States Court of Appeals for the Fourth Circuit concluded in *Parish v. Siemens Medical Solutions USA, Inc.*, 429 Fed. Appx. 216, 218, 2011 WL 1750290, at *2, that

> the district court did not err in concluding that Parish failed to make a prima facie showing of discrimination.  While Parish is a member of a protected class, and did suffer an adverse employment action, he was not performing his duties at a level that met Siemens's legitimate expectations.  The record is replete with examples of management dissatisfaction with Parish's performance.  Kuhfahl, Mazuroski, and Walsh received frequent and harsh complaints from Parish's subordinates, his colleagues, and other groups in the organization. Mazuroski offered specific performance improvement guidelines, and Parish was simply unsuccessful at improving his performance to a level that met his employer's expectations. Under these facts, we see no error in the district court's grant of summary judgment in favor of Siemens.

year resident").

The only "evidence" in this case that Plaintiff was meeting Defendant's legitimate expectations is his declaration of his own belief. However, Plaintiff's subjective disagreement is not sufficient to establish a genuine issue of material fact for trial. *See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 216–18 (4th Cir. 2007) ("[i]t is the perception of the decisionmaker which is relevant") (citation omitted); *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000) (same) (citations omitted); *Dejarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (same (citations omitted); "the plaintiff's perception of [her]self . . . is not relevant" (citing *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980)); "[s]imilarly, that plaintiff's coworkers "may have thought that [she] did a good job, or that [she] did not 'deserve' [to be discharged], is close to irrelevant" (citing *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 235 (4th Cir. 1991))); *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 959, 960 (4th Cir. 1996) (plaintiff's "own affidavit, mostly made up of conclusory statements about her qualifications and the deficiencies of her colleagues," was insufficient to establish a *prima facie* case of discrimination); *Goldberg*, *supra*, 836 F.2d at 848 (plaintiff's own opinions and conclusory assertions that facts are in dispute are not enough to survive summary judgment).

The material fact here, which is supported by the summary judgment record, is that Hallett, the decision maker, believed that Plaintiff was not performing at a satisfactory level. Courts do "not sit as a 'super-personnel department weighing the prudence of employment decisions' made by the [employer]." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 272 (4th Cir. 2005) (quoting *DeJarnette*, 133 F.3d at 299). In discrimination cases, "the Court's task is not 'to decide whether the reason [for termination of employment] was wise, fair, or even correct, ultimately, so long as it truly was the reason for [the decision].'" *Mercer v. Arc*

-35-

*of Prince Georges County, Inc.*, 532 Fed. Appx. 392, 399, 2013 WL 3470489, at *7 (4th Cir. 2013) (quoting *Laing v. Fed. Express Corp.*, 703 F.3d 713, 723-24 (4th Cir. 2013)). Accordingly, Plaintiff has failed to establish a *prima facie* case of race discrimination.

The evidence reveals that Plaintiff's complaint is deficient on other grounds, too.

Within a span of just a few months, Plaintiff was hired and fired by the same individual, Hallett. As the United States Court of Appeals for the Fourth Circuit observed in *Proud v. Stone*, 945 F.2d 796 (4th Cir. 1991),

> [o]ne is quickly drawn to the realization that "[c]laims that employer animus exists in termination but not in hiring seem irrational." From the standpoint of the putative discriminator, "[i]t hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job." Donohue & Siegelman, *The Changing Nature of Employment Discrimination Litigation*, 43 Stan. L. Rev. 983, 1017 (1991). Therefore, in cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer.

*Proud*, 945 F.2d at 797. *See also Evans*, *supra*, 80 F.3d at 959 (where the person who hired the individual is the same person who later took adverse action against the individual there is a "powerful inference" that the decision "was not motivated by discriminatory animus") (quoting *Proud*, 945 F.2d at 798; and citing *Mitchell*, *supra*, 12 F.3d at 1318); *Brailey v. Advance America Cash Advance Centers of Virginia, Inc.*, 2009 WL 8747823, at *8 (E. D. Va. 2009), aff'd., 379 Fed. Appx. 298 (4th Cir. 2010) (as the decision maker "knew [plaintiff] was African-American when he recommended hiring [him], given their in-person interview, it is unlikely that racial animus motivated his decision a few months later to fire [plaintiff]").

Nor is there any evidence that Plaintiff was treated any differently than similarly situated white employees. Although Plaintiff claims that Defendant's employment policies require that

he must be subjected to progressive discipline before he could be discharged, my review of the progressive discipline policy in the preceding section of this opinion establishes that Plaintiff's assertion is simply untrue.  As I have already observed, the progressive discipline policy clearly does not under any circumstance *require* progressive discipline, and even if it did, the progressive discipline policy expressly provides that an employee may be discharged at any time without proceeding through any of the preceding stages of progressive discipline.  Although Plaintiff alleges that unnamed white employees had been provided progressive discipline, he does not describe the misconduct of those unnamed employees, much less describe in what way those unnamed employees may have been similarly situated to him, and thus his allegation is mere speculation.[11]  *See Haywood v. Locke*, 387 Fed. Appx. 355, 359-60, 2010 WL 2711294, at *3 (4th Cir. 2010) ("plaintiffs are required to show that they are similar in all relevant respects to their comparator," *i.e.*, there must be "enough common features between the individuals to allow [for] a meaningful comparison"; this requires a showing that the individuals being compared "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it") (citations omitted); *Tabor v. Freightliner of Cleveland, LLC*, 2009 WL 1175329 (M. D. N.C. 2009) ("[a] showing of disparate discipline 'usually requires direct comparisons in order to raise a presumption that

---

[11] Plaintiff includes allegations that Hallett, Owen, and Hemmel were responsible for recalled, mislabeled, or otherwise faulty products, but that, unlike Plaintiff, they were not discharged for these alleged acts. Assuming the truth of these allegations, they are irrelevant.  In the first instance, Plaintiff was not discharged because products were defective.  Rather, Plaintiff was fired because, among other things, he failed to be responsive to Defendant's customers when he was assigned the task of finding a solution to various issues.  Thus, the comparisons he attempts to draw between himself and Hallett, or Owen, or Hemmel, are inapposite.  Furthermore, as documented earlier in this opinion, Plaintiff presented numerous other performance issues, including internal complaints of failing to sign off on regulatory documents, missing documents, and an apparent lack of technical expertise.  There is no evidence that Hallett, Owen, or Hemmel presented these performance issues.

-37-

Defendant's disparate treatment stemmed from Plaintiff's [race] rather than from [his] actions alone'") (citation omitted), *aff'd*, 388 Fed. Appx. 321, 2010 WL 2836184 (4th Cir. 2010). In fact, the evidence in the record that comes closest to a proper comparison of employees similarly situated to Plaintiff was provided by Stone, who testified that seven white managers had been fired by Defendant without the benefit of progressive discipline, and that this group included one quality director whose position was similar to, or even a "tad above," Plaintiff's position. And, given that the group about which Stone testified included one quality manager who reported directly to Plaintiff, his claim that white employees were not fired without first being subjected to progressive discipline lacks resonance.

## V.

Regarding Plaintiff's submissions in response to the motion for summary judgment, none of the material he has submitted raises a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). Indeed, as I mentioned earlier in this opinion, the bulk of Plaintiff's submissions consist of speculation, hearsay, or opinion (including Plaintiff's testimony as to his own performance and his testimony regarding the alleged beliefs of other non-decision-makers about his performance), and are therefore inadmissible. Still, out of an abundance of caution, I will address those of his arguments that have not already been clearly addressed or obviated elsewhere in this opinion.

Plaintiff asserts that, regarding his poor performance, Defendant has failed to provide documentation that Plaintiff was not performing up to Defendant's standards, and that the use of deposition testimony, without affidavits in support from the complaining customers, is improper. Plaintiff is wrong. However, one of the exhibits, quoted almost in full above, is an e-mail that

-38-

Hallett sent to Fullerton two days before Plaintiff was fired.  That e-mail documented a history of complaints and concerns about Plaintiff, which are likewise documented in Hallett's memo to Stone and supported by the inventory of Plaintiff's office.  Furthermore, deposition testimony concerning third-party customer complaints is relevant and admissible, not to show the truth of the complaints, "but as an explanation of why [the employer] believed that terminating the plaintiff's employment . . . was necessary and appropriate."  *Royall v. Nat'l Ass'n of Letter Carriers*, 507 F. Supp. 2d 93, 98 n. 10 (D. D.C. 2007); *see also Crockett v. Abraham*, 284 F.3d 131, 134 (D.C. Cir. 2002) (finding that an employer's account of a committee's view of candidates for a position, as it had been reported to her, was not hearsay where the employer's decision not to promote the plaintiff "was under challenge, and she explained it on the basis of the information she received"); *Maday v. Pub. Libraries of Saginaw*, 480 F.3d 815, 819-20 (6th Cir. 2007) (affirming the admission of third-party statements regarding the job performance of the plaintiff where the statements were offered "to show the reason why the employer took the action it did"); *Garner v. Missouri Dep't of Mental Health*, 439 F.3d 958, 960 (8th Cir. 2006) (finding that the employer's testimony as to an unsubstantiated allegation made by third parties against the plaintiff "was offered to explain why [the employer] suspended [the plaintiff]" and thus was not hearsay) (also noting that "[e]vidence demonstrating the employer's state of mind is of crucial importance in wrongful discharge cases") (quotation omitted); *Luckie v. Ameritech Corp.*, 389 F.3d 708, 716 (7th Cir. 2004) (finding that third-party statements were not hearsay because they were "offered to show [the employer's] state of mind at the time she was evaluating [the plaintiff's] performance"); *Arrington*, *supra*, 490 Fed. Appx. at 544, 2012 WL

3104853, at *3.[12]

Plaintiff states that Hallett allegedly never liked Plaintiff because Plaintiff is African-American, and the reason Plaintiff was hired to begin with is that Defendant wanted to secure a multi-million dollar contract with a new customer – Beiersdorf – and Plaintiff could help with that goal, yet be expendable afterwards.  This is unsupported speculation, which is irrelevant in the face of the summary judgment record.  Moreover, this and other allegations – such as Defendant's alleged mistreatment of African-Americans (noted here,[13] again out of an abundance

---

[12] As the Fourth Circuit observed in *Arrington v. E.R. Williams, Inc.*, 490 Fed. Appx. 540, 544, 2012 WL 3104853, at *3 (4th Cir. 2012):

> Arrington argues principally that much of the evidence relied on by the district court was hearsay that should not have been considered.  This contention, however, flows from a misunderstanding of hearsay.  Under the Federal Rules of Evidence, "hearsay" is, in critical part, a statement that "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed.R.Evid. 801(c).  It follows, then, that a statement is not hearsay where the proponent offers it not to prove the truth of the matter asserted but rather for another purpose.  Here, as the district court properly ruled, evidence of employee and client complaints about Arrington's performance was considered because ERW and Williams's "decisionmaking was under challenge, and [they] explained it on the basis of the information [they] received," *Crockett v. Abraham*, 284 F.3d 131, 134 (D.C. Cir. 2002).  Where, as here, "third-party statements concerning the plaintiff's performance are offered not for the truth of the matters asserted therein, but as an explanation of why [the employer] believed that terminating the plaintiff's employment . . . was necessary and appropriate," evidentiary rules governing the consideration of hearsay are not implicated.  *See Royall v. Nat'l Ass'n of Letter Carriers*, 507 F. Supp. 2d 93, 98 n. 10 (D. D.C. 2007).

[13] Plaintiff asserts that Defendant's senior management "openly made racially and minority insensitive statements."  However, my review shows that Plaintiff's allegations mention nothing that was directed towards Plaintiff or his race, nor anything directed at African-Americans at all.  Rather, Plaintiff alleges that Hallett called a Latino employee "dumb," and wanted to fire him; Hallett called a female customer "fat"; and that Hallett called another individual (apparently a customer, and not an employee) a "menace" and "Viet Nam's revenge."  However, these comments do not demonstrate a discriminatory animus in general, and certainly not animus towards African-Americans or Plaintiff as an African-American.  Nor is there any indication that Plaintiff ever complained of observing or experiencing any discriminatory animus.

Plaintiff offers speculative allegations that Defendant did not offer African-Americans the same opportunities as whites to obtain higher wage positions.  However, Plaintiff's speculations are inadmissible, given that his lawsuit is based on a claim of disparate treatment, and not for disparate impact on African-Americans in general.  Nor were these allegations mentioned in the complaint or Plaintiff's EEOC charge.  The scope of a plaintiff's federal law suit is determined by the contents of the plaintiff's initial charge in his

(continued...)

of caution) – was not raised in Plaintiff's charge of discrimination with the EEOC.  Plaintiff's inadmissible speculations, raised in response to Defendant's well-developed summary judgment motion and record, are of no value, given that his lawsuit, based on his being fired, is a claim of disparate treatment, and not for alleged discrimination against African-Americans in general, which would be a claim of disparate impact.  And, as these allegations were not mentioned in the complaint or, significantly, the EEOC charge, they cannot be considered by the court.  The scope of a plaintiff's federal law suit is determined by the contents of the plaintiff's initial charge in his administrative EEO complaint.  *See, e.g., Bryant, supra*, 288 F.3d at 132-33 ("the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination").

## VI.

For the stated reasons, Defendant's motion for summary judgment will be granted.  An appropriate order accompanies this memorandum opinion.

Entered this ____23rd____ day of January, 2014.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

---

[13](...continued)
administrative EEO complaint.  *See, e.g., Bryant v. Bell Atlantic Maryland, Inc.*, 288 F.3d 124, 132-33 (4th Cir. 2002) ("the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination").

 I note one last item regarding Plaintiff's allegations of Defendant's racial discrimination against its African-American employees.  Plaintiff claims that Defendant's African-American employees were required to enter on the left side of Defendant's plant, while white employees were required to enter on the right.  Plaintiff states that the "production area" was to the left, and the management offices were to the right.  However, Plaintiff does not claim that he entered through the production area, and Defendant notes that "all production employees, White or Black, would go to the left and all managers, White or Black, including Warren who was a manager, would go to the right."